ROSEMARY LEDET, Judge.
| t This is a class action arising out of a project to sandblast and paint a large, elevated water tower that abuts a residential neighborhood in Algiers, Louisiana (the “Algiers Water Tower”). Alleging damages directly resulting from the adverse effects of the project, the plaintiffs brought this class action against the general contractor, Capitol Enterprise, Inc. (“Capitol”); and the owner of the water tower, the Sewerage & Water Board of New Orleans (the “S & WB”). After settling with Capitol, the S & WB, and the primary insurers, the plaintiffs went to trial against the excess insurer, the Fireman’s Fund Insurance Company (“FFIC”). From a judgment on liability in favor of the plaintiff-class and a judgment on damages in favor of each of the seven named class representatives (awarding each of them $20,000 in compensatory damages), FFIC appeals. The class representatives individually and on behalf of the class (collectively “Plaintiffs”) answer the appeal. For the reasons that follow, we affirm.

*478
UFACTUAL AND PROCEDURAL BACKGROUND

In April 2001, the S & WB entered into a contract with Capitol to sandblast and paint the Algiers Water Tower. Because of the proximity of the water tower to a residential neighborhood, the contract contained requirements designed to protect the neighborhood.[1] One of those requirements was the contractor’s use of a 100% containment shroud. Explaining that requirement, the contract documents state:
“A lead based paint survey and public health risk assessment was conducted at the Algiers Elevated Water Tank which indicated that levels of lead contained in the existing paint system are a potential public health risk. Therefore, it is mandatory to use a Steel Structures Painting Counsel (SSPC) Class 1 A [ (100%) ] containment on the tank.”
The “Plans and Notes to Contractor for the Project” likewise reference the contractor’s mandatory use of a SSPC Class 1 A containment and state that “[t]he containment must maintain a negative pressure as verified by both visual and instrument observations. This pressure shall be sufficient to prevent any spent material or dust from leaving the enclosure during the cleaning.” The contractor also was assigned the responsibility to ensure the containment system satisfied the SSPC standards and to comply with all state and federal regulations.
The exterior sandblasting and painting of the water tower took place between December 2001 and March 2002 with actual work taking place on approximately thirty-eight calendar days. During the project, significant amounts of silica, sand, dust, and other particles were released into the surrounding area. ^According to David Mitchell, Ph.D., Plaintiffs’ air modeling expert, Capitol’s sandblasting had a significant impact on the neighborhood abutting the water tower. Dr. Mitchell noted that the work records document numerous problems with the emission containment system, document numerous complaints by the public from the neighborhood surrounding the Algiers Water Tower, and document numerous violations of visible emission limits. Dr. Mitchell opined that “the weather conditions (wind speed and direction) and lack of proper containment procedures by Capitol Enterprises, Inc. permitted the transport and disposition of significant concentrations of airborne particulate matter and dust downwind of the job site.” These emissions were caused, at least in part, by Capitol’s deviation from the specifications by using 85% mesh containment as opposed to the required 100% containment.
In April 2002, Helen Benn Jones; Johnny Jones, III; Barbara Benn; Evelyn Gastinell; and Melanie Williams commenced the instant class action against Capitol and the S & WB. Plaintiffs alleged that Capitol’s sandblasting and painting activities directly and adversely impacted the residents, home owners, and businesses in the area adjacent to the water tower. The petition avers that Plaintiffs were damaged in the following respects:
• That the sand and paint being utilized and the height from which it is being dispersed results in the substances being carried extensive distances by the wind.
*479 • That the aforementioned sandblasting is a gross imposition on the neighborhood and a severe nuisance resulting from the creation of noise and the release of particulate and chemical matter in the neighborhood. Despite attempts to cover the project, with plastic sheeting, the neighbors are subject 14to sand, dust and paint falling on their homes, businesses, cars, shrubbery, gardens, etc. The sand, dust and paint clog air conditioning and heating units and is tracked into homes, soiling carpets, upholstery, floors, etc.
• That further, the sand being utilized, likely silica, is an extremely abrasive substance and causes scratches, pit marks, on and in homes and on automobiles. The effect is made worse when residents attempt to wipe the substance off their property, homes and cars.
• Petitioners and the residents of the area are of the belief that the silica and/or paint utilized contains chemicals that adversely impact their health and causes them fear of additional health problems in the future, including, cancer.
• Petitioners and residents fear that the sand, dust, pain[t] and chemicals being utilized will cause further damage over time to their homes, automobiles, lawns, gardens, indoor and outdoor furniture, etc. because of the potential corrosive nature of the substances involved.
• The actions and inactions of the defendants have caused the plaintiffs and the residents of the area to experience mental anguish and distress, emotional upset, inconvenience, loss of sleep, worry and concern, and loss of their time in cleaning up the mess created by the project.
• Petitioners and the residents of the area have and are experiencing physical symptoms, including, but not limited to, eye, nose and throat irritation, coughing or sneezing, skin irritation, aggravation of preexisting respiratory and sinus problems, as well as other problems.
In March 2004, following an extensive evidentiary hearing, the trial court certified the class, which it defined as follows:
All persons who live or own property or who can prove to the satisfaction of the court that they were consistently present in the area for a substantial period of time from December 1, 2001 through March 13, 2002, within the boundaries hereafter set in New Orleans, Louisiana, who claim, claimed, and/or sustained bodily/or personal injury, loss, property damage, and/or other damage, as a result of the Algiers Water Tower sandblasting project.
The trial court defined the boundaries as follows:
Begin at the intersection of Westchester Place and Patterson Drive, then proceed south along Westchester Place to its intersection with Carlisle Court; then left/ east on Carlisle Court, proceeding down Carlisle Court across Sullen Place to Peony Street to its end, then to a straight line to the Intraeoastal Waterway; then left/northeast along the |fiIntracoastal Waterway to the point where it would intersect with the end of Patterson Drive; then left/westerly along Patterson Drive to the point of beginning. Where a street is a boundary of this Class, it is intended that the Class area include those who reside on both sides of the street.
The trial court in its judgment recognized two additional class representatives— Bernice Noil and Augustine Cook — bringing the total number of class representa *480 tives to seven. No appeal was taken from the judgment certifying the class.
In March 2005, Plaintiffs filed a'first amending petition adding as defendants the primary insurers: Royal Insurance Company of America (“Royal”), and American International Specialty Lines Insurance Company (“AISLIC”). On Plaintiffs’ motion, the trial court dismissed AISLIC as a defendant without prejudice.
In April 2005, Plaintiffs filed a motion for partial summary judgment on the issue of insurance coverage available to Capitol and the S & WB under Royal’s policy. Particularly, Plaintiffs sought a declaration that the general aggregate limits of Royal’s policy ($2,000,000.00) should apply rather than the per occurrence limits ($1,000,000.00). The trial court granted Plaintiffs’ motion for partial summary judgment. This court dismissed Royal’s appeal from this judgment on the basis that it should not have been certified as final and appealable because this issue was “but one of many insurance issues to be decided before a trier-of-fact can reach the issue of damages.” Jones v. Capitol Enterprises, 06-0163 (La.App. 4 Cir. 9/20/06), 939 So.2d 742 (unpub.).
| ^Meanwhile, in October 2005, Plaintiffs filed a second amending petition adding several new defendants including FFIC, as the excess insurer to Royal and AISLIC; and Delta Testing & Inspection, Inc. (“Delta”), the consulting company the S & WB retained to monitor quality on the Algiers Water Tower project. In June 2007, FFIC filed a motion for summary judgment contending that coverage was excluded by the pollution and lead exclusions of its policy.[2] In August 2007, the trial court denied FFIC’s motion.
Also in August 2007, the trial court approved a partial settlement agreement between Plaintiffs and multiple defendants: Capitol, the S & WB, Delta, Delta’s insurer (Landmark), Royal, and AISLIC. Plaintiffs released all claims against Capitol and the S & WB, but reserved then-right to pursue any collectible insurance available to those defendants, specifically from the excess insurer, FFIC, consistent with the applicable jurisprudence, particularly Gasquet v. Commercial Union Ins. Co., 391 So.2d 466 (La.App. 4th Cir.1980).[3] The parties expressly acknowledged that the excess insurer, particularly FFIC, would be “granted a credit consistent with the jurisprudence as set forth in Gasquet, id., against total recoverable damages, if the insurance policies mandate such a credit, and only to the extent that such credits legally exist.”[4] Pursuant to the *481 settlement, Capitol and the S & WB 17remained in the suit as nominal defendants for purposes of future litigation to establish the liability, if any, of the excess insurer, FFIC.
In October 2007, a three-day trial was held. Two types of issues were tried: (i) the class-wide, common issues of the liability of Capitol and the S & WB (the nominal defendants) and FFIC’s insurance coverage, and (ii) the individual issue of the damages due the seven named class representatives. At the close of Plaintiffs’ case, FFIC filed a motion for directed verdict, which the trial court denied.
In June 2008, the trial court rendered judgment and detailed reasons for judgment. The June 2008 judgment incorrectly awarded class-wide damages based on four geographic “zones” outlined in the reasons for judgment. The June 2008 judgment further provided that “for the written reasons assigned” judgment is rendered for the five (as opposed to seven) named class representatives of $20,000 each against Capitol, the S & WB, and FFIC.[5] The judgment still further provided that FFIC was entitled to a credit in the amount of $3,889,628.90, which was based on the underlying policy limits contained in the AISLIC policy (after deduction of approved fees and costs) of $1,889,623.90, and the Royal policy of $2,000,000.00 (“FFIC’s Credit”). From this judgment, cross-motions for new trial were filed.
|sIn March 2011, the trial court granted the motions for new trial and issued an amended judgment. The amended judgment excluded the class-wide damage award, but included the same award to the named class representatives — all seven of them — of $20,000 each in compensatory damages ($140,000 total). In the amended judgment, Capitol and the S & WB were found equally at fault. As the trial court noted in its original written reasons, it found fault on the part of both Capitol and the S & WB for the following reasons:[6]
• “When Capitol encountered problems installing the containment and potential damage to the structure of the Water Tower arose, Capitol ordered a lighter material containment to correct the problem. After the permeable mesh shroud was ordered, SWB authorized the new construction. Both Defendants agreed to use the 85% ■ mesh containment shroud and both thought that they could make it work while avoiding harmful emissions. However, as a result of this alternative, usage 81.44% of the sand integrated into the project was lost and unaccounted for as compared to the 1% typically emitted.”
• As to Capitol, the court noted that in its capacity as the contractor it had “the responsibility and duty to utilize *482 the 100% containment shroud, made of coated material, which had been used in all other projects Capitol had completed.”
• As to the S & WB, the trial court noted that “[p]rior to the project commencement, it was recommended that SWB implement air monitoring for lead and silica in order to reduce health risks, but SWB chose to monitor only for lead, although it had always been aware of neighborhood concerns associated with such projects. After Capitol chose to utilize the 85% shroud, the SWB project engineer approved the containment, did not view it as a problem, and allowed the activities to go forward. Mr. Phillips, a Delta employee, who reviewed the emission reports, informed SWB of excessive emissions. Additionally, although SWB claims that Delta’s emission reports were [ 9untimely, the Court finds that SWB was provided with weekly reports, but made no use of those reports and took no corrective action regarding the specification violation. Moreover, the Court notes that although SWB is owner of the Water Tower, they rarely had any employee at the project site.”
• “The specifications of the project and contract itself provide that spent abrasive material was to be disposed of in a certified landfill with records maintained. The sand purchase and disposal records in evidence show that a substantial amount of the sand is unaccounted for. Had the containment been a Class 1-A 100% shroud, most of the sand utilized would have been accounted for. Given the substantial difference between sand purchased and the disposal, some 468,000 pounds, the Court is compelled to find that extensive amounts of silica dust was emitted from the project and found its way into the neighborhood and impacted a substantial amount of people.” The court noted that Dr. Mitchell’s expert testimony buttressed its finding.
• “The Defendants had a combined duty to use the utmost caution throughout the duration of their project, but failed to do so with their use of the 85% shroud.”
The trial court found that the S & WB’s liability “arises out of’ Capitol’s work at the Algiers Water Tower. As noted elsewhere in this opinion, this is a requirement under FFIC’s policy for coverage as an additional insured. The trial court thus found as a matter of fact and law that FFIC had a policy of excess liability insurance that covered both Capitol, as a direct insured, and the S & WB, as an additional insured.
The trial court limited the judgment against the nominal defendants, Capitol and the S & WB, “to the extent that there is available applicable insurance policies” to cover their liability including but not limited to FFIC. The trial court limited the judgment against FFIC to its policy limit of $10,000,000, and recognized FFIC’s Credit of $3,889,623.90.
The trial court found as a matter of fact and law that as a direct result of the sandblasting and painting of the Algiers Water Tower the class representatives suffered injuries and damages legally caused by Capitol and the S & WB. | Accordingly, the trial court rendered judgment against FFIC, in solido with its insureds, Capitol and the S & WB, for “all compensatory damages determined herein for the plaintiff class representatives [$20,-000.00 each] and [for damages] hereafter determined for the class members, with judicial interest from date of demand on April 16, 2002, until paid, and for all costs.” *483 From this judgment, FFIC appeals;[7] Plaintiffs answer the appeal.[8]

STANDARD OF REVIEW

Under the Louisiana Constitution, “appellate jurisdiction of a court of appeal extends to law and facts.” La. Const. Art. 5, § 10. Questions of fact are reviewed under the manifest error standard. See Ferrell v. Fireman’s Fund Ins. Co., 94-1252, pp. 3-4 (La.2/20/95), 650 So.2d 742, 745. Mixed questions of law and fact are also reviewed under the manifest error standard. Chimneywood Homeowners 11Ass’n, Inc. v. Eagan Ins. Agency, Inc., 10-0368, 10-0369, p. 5 (La.App. 4 Cir. 2/2/11), 57 So.3d 1142, 1146 (citing CII Carbon, L.L.C. v. Nat’l Union Fire Ins. Co. of Louisiana, Inc., 05-0071 (La.App. 4 Cir. 8/17/05), 918 So.2d 1060, 1065). “If the trial court’s findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse.” Ar-abie v. CITGO Petroleum Corp., 10-2605 (La.3/13/12), 89 So.3d 307 (citing Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)). “[Wjhen there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous.” Arabie, supra (citing Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 883 (La.1993)).
Questions of law are reviewed de novo “without deference to the legal conclusions of the courts below.” Durio v. Horace Mann Ins. Co., 11-0084, p. 14 (La.10/25/11), 74 So.3d 1159, 1168. As to questions of law, “the standard of review of an appellate court is simply whether the court’s interpretive decision is legally correct.” Ohm Lounge, L.L.C. v. Royal St. Charles Hotel, L.L.C., 10-1303, p. 4 (La.App. 4 Cir. 9/21/11), 75 So.3d 471, 474 (citing Glass v. Alton Ochsner Medical *484 Foundation, 02-0412, p. 3 (La.App. 4 Cir. 11/6/02), 882 So.2d 403, 405). “[I]f the decision of the trial court is based upon an erroneous application of law rather than on a valid exercise of discretion, the decision is not entitled to deference by the reviewing court.” Id. (citing Pelleteri v. Caspian Group Inc., 02-2141, pp. 6-7 (La.App. 4 Cir. 7/2/03), 851 So.2d 1230, 1234-35).
A trial court’s ruling denying a motion to decertify a class is one involving a valid exercise of discretion and therefore is reviewed under an abuse of discretion 112standard. Billieson v. City of New Orleans, 09-0410, 09-0811, p. 9 (La.App. 4 Cir. 11/12/09), 26 So.3d 796, 802, writ denied, 10-0064 (La.6/4/10), 38 So.3d 301 (citing Doerr v. Mobil Oil Co., 04-1789, p. 4 (La.App. 4 Cir. 6/14/06), 935 So.2d 231, 234); Richardson v. American Cyanamid Co., 99-675 (La.App. 5 Cir. 2/29/00), 757 So.2d 135.
An abuse of discretion standard also applies to the review of a trial court’s general damages award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993). The fact finder has great discretion in determining the amount of damages, and appellate courts should rarely disturb such an award. Id.

DISCUSSION

For purposes of discussion, the myriad of issues raised by the parties are divided into the following four categories: (1) the S & WB’s additional insured status, (2) FFIC’s Credit, (3) class decertification, and (4) quantum of individual claim representatives’ damage awards. We separately address each of these issues.
(1) The S & WB’s additional insured status
FFIC contends that the trial court erred in holding that the S & WB is an additional insured for its 50% comparative fault. FFIC acknowledges that the contract between Capitol and the S & WB required the S & WB be named as an additional insured,[9] but it contends that the court must examine the policy language to determine the scope of the coverage required. According to FFIC, under the terms of its policy a party is not an additional insured for liability resulting from that party’s own negligence.
11sThe interpretation of an additional-insured endorsement is a question of law, which requires an examination of the language of the particular endorsement to determine its meaning. Miller v. Superior Shipyard and Fabrication, Inc., 01-2907, p. 5 (La.App. 1 Cir. 8/20/03), 859 So.2d 159, 163. FFIC’s policy contains a “follow form” term that provides it follows and adopts the definitions, terms, conditions, limitations, exclusions, and warranties set forth in the underlying primary policy, which was issued by Royal to Capitol.[10] Royal’s policy defines an “additional insured” as follows:
ADDITIONAL INSURED — BY CONTRACT, AGREEMENT OR PERMIT *485 This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE FORM
The following is added to SECTION II — WHO IS AN INSURED:
1. a. Any person or organization you are required by written contract, agreement or permit to name as an additional insured is an insured but only with respect to liability arising out of:
1. “Your work” performed for that insured at the location described in the contract, agreement or permit; or
2. Premises owned or used by you.[11]
| uAs noted, the trial court in its judgment made an express finding that the S & WB’s liability “arises out of Capitol’s work at the Algiers water tower.” FFIC acknowledges that finding, but it emphasizes that the trial court also found the S & WB 50% at fault for its own negligence. FFIC argues that under its policy the coverage available to the S & WB is limited to its liability imposed as a result of Capitol’s actions — vicarious (or imputed) liability — and does not extend to the S & WB’s independent fault (negligence). Given the trial court’s finding that the S & WB was 50% at fault, FFIC contends that the S & WB cannot be an additional insured under its policy.
In support of its position, FFIC contends that under Louisiana jurisprudence an entity that is added to an insurance policy as an additional insured by contract is only covered for its derivative liability for the negligence of the named insured. For this proposition, FFIC cites Miller, supra; and Holzenthal v. Sewerage & Water Bd. of New Orleans, 06-0796 (La.App. 4 Cir. 1/10/07), 950 So.2d 55. FFIC’s reliance on these cases is misplaced.
In Miller, supra, the case was before the appellate court on remand from the Supreme Court to review a trial court’s grant of a partial summary judgment in T.T.C.’s (the additional insured’s) favor on the issue of its coverage as an additional-insured under Lexington’s commercial general liability policy. Lexington argued, as does FFIC here, that under its named insured endorsement T.T.C. was not a named insured for its own negligence.[12] Rejecting this argument, |1sthe appellate court reasoned that “[t]he plain wording of the endorsement shows that it applies to any potential liability sought to be imposed upon the additional insured (T.T.C.) because of something the named insured (Superior) is alleged to have done or failed to have done in connection with the named insured’s (Superior’s) operations.” Miller, 01-2907 at p. 6, 859 So.2d at 163-64. The appellate court found that the plaintiffs *486 allegation that T.T.C. was vicariously liable for the named insured’s acts was within the scope of the additional-insured endorsement. The appellate court, however, noted that “[t]here is no specific allegation of T.T.C.’s individual fault.” Miller, 01-2907 at p. 7, n. 6, 859 So.2d at 164. The appellate court in Miller thus was not presented with the issue presented in this case of whether the additional insured was covered for its own fault.
Nor was the issue presented in the Hol-zenthal case. In that case, this court affirmed the trial court’s finding that the defendant-S & WB was not an additional insured. In so finding, we noted the policy at issue provided that the defendant-S & WB was an additional insured “only with respect to liability arising out of your [Brown’s] operations or premises owned by or rendered to you [Brown].” Holzenthal, 06-0796 at p. 49, 950 So.2d. at 84. We further noted that there was no allegation that the defendant-S & WB’s liability arose out of Brown’s activities, and “no allegation that Brown was in any way negligent or failed to comply with its contractual obligations or the plans and specifications for the Project as they related to Brown.” Holzenthal, 06-0796 at p. 50, 950 So.2d. at 84. We thus found that the defendant-S & WB was not covered as an additional insured because “[n]one 11ñof the plaintiffs alleged any damages arising out of Brown’s operations or premises owned by or rendered to Brown.” Id.
The instant case is distinguishable from both the Miller and Holzenthal case. In the instant case, Plaintiffs contend that the S & WB was individually at fault and that their damages arise out of the named insured’s (Capitol’s) operations. They further contend that the negligence of Capitol is paramount and the source of the S & WB’s liability. This case thus presents the issue of whether an additional insured provision that restricts coverage to liability “arising out” of the named insured’s “work” extends to the additional insured’s own negligence. Because there apparently is no Louisiana case directly addressing the issue, we look for guidance to other state court holdings.
The majority of other state courts that have addressed the issue presented in the instant case have broadly construed the additional insured provision to find coverage. “While the insurance industry believed that this coverage would extend no further than instances where the additional insured is vicariously liable for the wrongs of the named insured, many courts have interpreted the language as providing a broader coverage grant.” 4 Philip L. Bruner & Patrick J. O’Connor, Jr., Bruner & O’Connor on Construction Law, § 11:155 (2010)(“Construction Law”). “Courts have been reluctant to narrowly construe the phrase ‘arising out of often employed in additional insured endorsements.” Id.; see also Allan D. Windt, Insurance Claims & Disputes: Representation of Insurance Companies And Insureds, § 11:30 (5th ed. 2011 Supp.)(noting that “[a] small minority of courts have held that a provision making a third party an insured for liability ‘arising out of the named insured’s operations’ serves solely to make third parties insured for their vicarious liability by reason of the named insured’s operations.”) The |17majority of courts have construed this kind of additional insured endorsement broadly “giving it a causal interpretation.” Construction Law, supra.; Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc., 256 S.W.3d 660, 666 (Tex.2008)(noting that the majority of courts have construed such endorsements using a “broader theory of causation.”) Under the majority view, a “fault-based interpretation of this kind of additional insured endorsement no longer prevails.” Evanston, supra.
*487 In reaching this result, the courts adopting the majority view have emphasized the insurer’s failure to include language in its policy clearly reflecting the intent that coverage extend only to the named insured’s wrongs. See Evanston, supra (noting that had the parties intended to insure the additional insured’s vicarious liability only “language clearly embodying that intention was available”); Mid-Continent Cas. Co. v. Chevron Pipe Line Co., 205 F.3d 222, 229 (5 Cir.2000)(noting that the “[insurer] easily could have limited coverage by including in the endorsement terms such as ‘vicarious liability’ or ‘negligence of the named insured.’ ”)
The majority view, broadly construing this type of endorsement as extending coverage to the additional insured’s own negligence, is consistent with the jurisprudence of this state. The Louisiana jurisprudence, albeit in addressing other coverage questions, has broadly construed similarly worded additional insured endorsements. Roundtree v. New Orleans Aviation Bd., 04-0702, pp. 17-18 (La.App. 4 Cir. 2/4/05), 896 So.2d 1078, 1090 (citing Gates v. James River Corp. of Nevada, 602 So.2d 1119 (La.App. 1st Cir.1992); Baker v. Sears, Roebuck & Co., 32,651, 32,767 (La.App. 2 Cir. 3/3/00), 753 So.2d 1011; and Fleniken v. Entergy Corp., 99-3024 (La.App. 1 Cir. 2/16/01), 790 So.2d 64). For this reason, we adopt the majority view. Broadly construing the additional insured provision at | isissue, we find no error in the trial court’s finding that the S & WB was covered as an additional insured under FFIC’s policy for its own negligence.
(2) FFIC’s Credit
The parties raise on appeal two separate issues regarding FFIC’s Credit. Plaintiffs, in their answer to the appeal, contest the amount of FFIC’s Credit. FFIC, in its appeal, cites the doctrine of compensation as requiring the dismissal of the individual named class representatives’ claims, for which a judgment of $140,000 was rendered, given FFIC’s Credit of $3,889,623.90. We separately address each issue.
(a) Amount of FFIC’s Credit
As noted, Plaintiffs contest the amount of FFIC’s Credit. Based on the per occurrence coverage limit in Royal’s policy, Plaintiffs contend that the amount of FFIC’s Credit should be reduced by one million dollars — from $3,889,623.90 to $2,889,623.90.[13] This position, however, is inconsistent with the position Plaintiffs have advocated throughout the protracted procedural history of this case. Indeed, Plaintiffs never raised the issue of whether the Credit should be reduced in the trial court. FFIC contends that Plaintiffs therefore are precluded from raising this issue for the first time on appeal. We agree.
Under the jurisprudence there is a “longstanding general rule that issues not submitted to the trial court for decision will not be considered for the first time on appeal.” ASP Enterprises, Inc. v. Guillory, 08-2235, p. 9 (La.App. 1 Cir. 9/11/09), 22 So.3d 964, 971; In re Succession of Bernat, 11-368, p. 3 (La.App. 3 Cir. 11/2/11), 76 So.3d 1287, 1290 (refusing to consider issue raised for first time on | ^appeal). As this court has noted “[i]t is well established that as a general matter, appellate courts will not consider issues raised for the first time, which were not *488 pleaded in the trial court below and which the trial court has not addressed.” Billieson v. City of New Orleans, 09-0410, p. 8 (La.App. 4 Cir. 11/12/09), 26 So.3d 796, 801-02 (citing Johnson v. State, 02-2382, p. 4 (La.5/20/03), 851 So.2d 918, 921).
This general rule is codified in the Uniform Rules of Louisiana Courts of Appeal, which provide: “[t]he Courts of Appeal will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise.” Uniform Rules— Courts of Appeal, Rule 1-3. Pursuant to Rule 1-3, this court cannot consider an issue that was not raised in the trial court “unless the interest of justice clearly requires otherwise.” See Brown v. Harrel, 98-2931, pp. 5-6 (La.App. 4 Cir. 8/23/00), 774 So.2d 225, 229 (citing Whitney Nat’l Bank v. F.W.F., Inc., 93-1152, p. 2, n. 1 (La.App. 4th Cir. 3/29/94), 635 So.2d 361, 363 and cases cited therein). Contrary to Plaintiffs’ suggestion, this is not a situation in which “the interest of justice requires otherwise.”
The protracted procedural history of this case dictates against allowing Plaintiffs to raise the issue of the reduction in FFIC’s Credit for the first time on appeal. In April 2005, Plaintiffs filed a motion for summary judgment in which they contended that the aggregate coverage limit of $2,000,000 — as opposed to the per occurrence limit of $1,000,000 — applied. In their motion, Plaintiffs framed the coverage issue as follows: “Louisiana case law holds that the events that form the basis of this action are a series of separate and distinct occurrences. [See Lombard v. Sewerage and Water Board of New Orleans, 284 So.2d 905 (La.1973).] Royal’s Imposition is that what occurred over a 4 month period of time on distinct separate days constitutes one single occurrence.” Plaintiffs thus argued that the “general aggregate” limits of Royal’s policy ($2,000,-000.00). applied; whereas, Royal argued that the “per occurrence” limit ($1,000,-000.00) applied. Finding in Plaintiffs’ favor, the trial court declared that the general aggregate limits of Royal’s policy ($2,000,000.00) applied. ■ In September 2006, this court declined to consider Royal’s appeal from this judgment on the basis that the partial summary judgment should not have been certified final and appeal-able. Jones v. Capitol Enterprises, 06-0163 (La.App. 4 Cir. 9/20/06), 939 So.2d 742 (unpub.).
In August 2007, Plaintiffs entered into a partial settlement agreement with several defendants, including Royal, based on an understanding that Royal’s coverage equaled its aggregate limit of $2,000,000.00. In settling their claim against Royal, Plaintiffs thus took advantage of the higher aggregate limit.-
In June 2008, following the trial, the trial court rendered judgment setting forth FFIC’s Credit as $3,889,623.90. In their motion for new trial from that judgment, Plaintiffs failed to raise any issue regarding the amount of FFIC’s Credit. To the contrary, Plaintiffs stated: “[o]n the substantive arguments directed to insurance coverage, plaintiffs respectfully submit that the Court was correct in its analysis and that no changes are warranted.” In March 2011, the trial court rendered an amended judgment, which was based on Plaintiffs’ proposed judgment, . setting forth FFIC’s Credit as $3,889,623.90.
In their answer to FFIC’s appeal from the March 2011 judgment, Plaintiffs now seek to take the opposite position: that the per occurrence limit ($1,000,000.00) applies and that FFIC’s Credit should only be $2,889,623.90. |2|Stated otherwise, Plaintiffs contend that the Credit should be reduced by one million dollars.
*489 Given the above procedural history of the case, it would be inequitable to allow Plaintiffs to argue this contrary position at this stage of the proceeding regarding the underlying coverage on which FFIC’s credit is based. We thus decline to consider the issue of the reduction in the amount of FFIC’s Credit.
(b) Compensation doctrine
As noted, FFIC’s compensation argument is that the seven named class representatives’ claims, having been reduced to final judgment in the amount of $140,000 ($20,000 each), must be offset against its credit of $3,889,628.90, and that their claims thus must be dismissed with prejudice. In support of this argument, FFIC cites the compensation doctrine codified in La. C.C. art. 1893, which provides:
Compensation takes place by operation of law when two persons owe to each other sums of money or quantities of fungible things identical in kind, and these sums or quantities are liquidated and presently due. In such a case, compensation extinguishes both obligations to the extent of the lesser amount.
In order for compensation, or any other form of set off, to apply a mutuality of obligations is required, i.e., “where each obligor owes the other a debt equally liquidated and demandable.” Ducote v. City of Alexandria, 95-1197, pp. 12-13 (La.App. 3 Cir. 3/6/96), 670 So.2d 1378, 1386 (citing La. C.C. art. 1893 and collecting cases). “[D]efendant must be the creditor with respect to one obligation and debtor with respect to the other and vice versa for the plaintiffs.” Ducote, 95-1197 at p. 13, 670 So.2d at 1386. Although under the trial court’s judgment FFIC owes an obligation to Plaintiffs for the amount of damages established to exceed FFIC’s Credit, Plaintiffs do not owe a separate and distinct obligation to FFIC. FFIC’s ^Credit is based not on an obligation owed to it by Plaintiffs, but on the nature of its contractual obligation as an excess insurer. As an excess insurer it has an obligation “to- pay amounts over and above the. primary policy limits.” Louisiana Ins. Guar. Ass’n v. Interstate Fire & Cas. Co., 93-0911 (La.1/14/94), 630 So.2d 759, 765. Indeed, the obligations of a primary and an excess insurer are conjunctive obligations that can be enforced separately. 15 William Shelby McKenzie & H. Alston Johnson, III, La. Civ. L. Treatise, Insurance Law & Practice § 221 (3d ed. 2011-12 Update)(citing Benroth v. Continental Cas. Co., 132 F.Supp. 270, 275 (W.D.La.1955)). FFIC’s reliance on the compensation doctrine is misplaced.
. FFIC is not entitled to have the named class representatives’ claims dismissed for , another reason. The trial court, in the amended judgment, rendered judgment in favor of not only the seven named class representatives, but also the other class members for damages “hereafter determined.” As Plaintiffs point out, FFIC’s obligation to the class must be determined based on the aggregate sum of the judgments of all the class members, whose claims must be individually tried. FFIC’s obligation to the class, including the named class representatives, is yet to be determined. For this reason, FFIC’s obligation to the class is neither liquidated nor presently due as required for La. C.C. art. 1893 to apply.
Plaintiffs point out that dismissing the named class representatives’ claims would defeat the whole purpose of a class action. Plaintiffs further point out that dismissal of the class representatives’ claims is inappropriate because it would be patently unfair for those claimants who prove their damages in earlier trials to bear a total offset instead of a pro rata allocation spread out over the class as a whole. *490 Plaintiffs note that “[t]hose who initially appear and receive awards decreasing the | ^credit are just as entitled in a class action to receive compensation as those later determined by the' court.” To achieve this result, Plaintiffs posit the following solution: “all class members will have to wait until all damages are awarded and the credit will be prorated to each member of the class taking into consideration the amounts a member has already received.”
FFIC counters that Plaintiffs’ “hold all the damage judgments till the end” solution is procedurally impermissible because the trial court has rendered a final judgment awarding damages to each of the individual class representatives. The final judgment, FFIC contends, cannot be' held in abeyance pending the determination of other class members’ damages. ' FFIC’s argument ignores that this is a class action. Its argument also overlooks that FFIC’s Credit is a “class wide credit,” arising from a class wide settlement with the underlying insurers. We thus find no error in the trial court’s refusal of FFIC’s request to dismiss the claims of the named class representatives based on the compensation doctrine.
(3) Class decertification
FFIC contends that the trial court erred in implicitly denying its motion to decertify the class. The governing provision regarding decertification is La. C.C.P. art. 592 A(8)(c), which provides:
In the process of class certification, or at any time thereafter before a decision on the merits of the common issues, the court may alter, amend, or • recall its initial ruling on certification and may enlarge, restrict, or otherwise redefine the constituency of the class or the issues to be maintained in the class action.
Article 592 allows a trial judge to decertify a class at any time before a decision on the merits of the common issues.
In this case, the trial court has rendered a decision on the merits of the common issues of the liability of the nominal defendants (Capital and S & WB) and |24FFIC’s insurance coverage. For this reason, FFIC’s motion to decertify, which was filed as part of its motion for new trial, arguably is untimely. Arguing to the contrary, FFIC contends that it first raised the decertification issue in its motion for new trial because this was the first available procedural opportunity for it to raise the issue. FFIC explains that the decerti-fication issue it raises was created by the trial court’s recognition in its reasons for judgment of the ramifications of Plaintiffs’ piecemeal settlement. According to FFIC, the, settlement has resulted in the class action device becoming an inferior method of resolving .the claims given FFIC’s Credit. In support of its timeliness argument, FFIC cites the jurisprudence holding that class certification decisions are interlocutory in nature and thus always subject to review. See Davis v. Jazz Casino Co., 03-0276, 03-1223 (La.6/6/03), 849 So.2d 497, 498.
Plaintiffs do not contest the timeliness of FFIC’s motion; rather, they contest the appropriateness of revisiting the issue of certification at this point in the case. Plaintiffs contend that a class action is an appropriate procedural vehicle for class members to pursue damages from an excess insurer after a class settlement with the underlying primary insurers has been reached.
Because the trial court’s judgment is silent as to the motion to decertify, it is unclear if the trial court found FFIC’s motion unpersuasive or untimely. Given Plaintiffs’ failure to contest the timeliness of FFIC’s motion coupled with our deter *491 mination that FFIC’s decertification arguments are unpersuasive, we pretermit the issue of whether FFIC’s motion was untimely.
FFIC’s argument regarding decertification has two components: a constitutional argument and a substantive one. Its substantive argument overlaps with its argument regarding dismissing the class representatives’ claims, addressed | ¡¡.¿above. FFIC contends that Plaintiffs’ partial settlement and the resulting FFIC Credit have created an unworkable conflict within the putative class and an unworkable procedural situation. FFIC further contends that Plaintiffs’ own “hold all the damage judgments till the end” solution demonstrates the inherent conflict created if the action is allowed to continue as a class action. The conflict, according to FFIC, is the result of the almost four million dollar credit that must be exhausted before any plaintiff can recover from FFIC. Moreover, FFIC contends that even if the “hold all the damage judgments till the end” solution posited by Plaintiffs is procedurally permissible, “the conflict would still exist, because potentially thousands of plaintiffs would have to stand in line to go to trial without having any assurance of ever receiving an actual recovery on their claims” from FFIC due to FFIC’s Credit. Hence, FFIC contends that class certification is not a superior means of resolving Plaintiffs’ claims.
In support of its position, FFIC cites the Louisiana Supreme Court’s recent decision Price v. Martin, 11-0853, p. 6 (La.12/6/11), 79 So.3d 960, 966, for the proposition that a “rigorous analysis” is required of the factors for determining whether a class action meets the requirements imposed by law. One of those factors is whether “a class action is superior to other available methods for the fair and efficient adjudication of the controversy.” La. C.C.P. art. 591 B(3). FFIC points out that in Price, swpra, which like this case was an emissions class action, the Supreme Court found certification inappropriate due to the inherent conflicts among the class members. In so holding, the Supreme Court noted that:
Whether an activity or work occasions real damage or mere inconvenience requires consideration of such factors as the character of the neighborhood, the degree of intrusion, and the effect of the activity on the health and safety of the neighbors, factors which do not lend themselves to resolution on a common, class-wide basis.
Price, 11-0853 at p. 19, 79 So.3d at 974 (citing Barrett v. T.L. James & Co., 28,170, pp. 6-7 (La.App. 2 Cir. 4/3/96), 671 So.2d 1186, 1191). FFIC contends that the application of the “rigorous analysis” required by Price of the certification factors to the circumstances of this case dictates that the class be decertified. In support, FFIC cites the unworkable conflict created by the partial settlement and the resulting recognition of FFIC’s Credit.
FFIC’s reliance on the Price case is misplaced. In Price, the issue before the Supreme Court was whether the trial court’s decision certifying the class, which the appellate court affirmed, was correct. In stark contrast, the class in this case was certified in 2004 (no appeal was taken from that decision), Plaintiffs settled with multiple defendants in 2007, Plaintiffs tried common issues of liability and coverage in 2007, the trial court rendered judgment in 2008, and the trial court granted the cross motions for new trial and rendered an amended judgment in 2011, which is the subject of this appeal. The instant case is therefore in a vastly different procedural posture than the Price case.
A significant factor that courts consider in deciding the issue of class decertifica *492 tion is “ ‘whether the parties or the class would be unfairly prejudiced by a change in proceedings at that point.’ ” 3 Alba Conte and Herbert Newberg, Newberg on Class Actions, § 7:47 (4th ed.2002)(quoting Manual for Complex Litigation, § 80.18 (2d ed.)). Such is the case here. If FFIC’s request to decertify the class were granted, FFIC would be dismissed from the class action. Pursuant to La. C.C.P. art. 594 A(2), the class members would be given a notice of the decertification. Pursuant to La. C.C.P. art. 596, the class members would have a window of time to decide whether to file their own individual suits against FFIC. ^Such a change in proceedings at this point would result in unfair prejudice to the class members whose individual expense of litigating their claims would outweigh any potential recovery.
The appropriateness of the procedural device of a class action to aid plaintiffs in recovering damages in this type of situation was noted by this court in Doerr v. Mobil Oil Corp., 04-1789, p. 10 (La.App. 4 Cir. 6/14/06), 935 So.2d 231, 238. Writing for the court, Judge Murray explained:
[I]t is a troubling proposition that a tortfeasor can be relieved of responsibility if its conduct produces minimal harm, albeit to many people. Surely a wrong that causes a hundred dollars of harm to ten thousand people is of no less concern than a wrong that causes a million dollars of harm to an individual. To declare the former harm de minimus, and not worthy of redress is to undermine the dual concerns of tort law: accountability for the wrongdoer and compensation for the victim.
... [I]t is a legitimate concern that the courts not be bogged down by claims that are minimal. It makes little economic sense to have parties engage in litigation over sums greatly outweighed by the expense of the legal process. However, where, as here, the claims of a large population can be processed efficiently by virtue of class certification, there can be no valid reason not to hold a corporate wrongdoer accountable and to afford appropriate relief to the individual members of the class.
Id. For these same reasons, we conclude that it would be patently unfair to the class members to decertify the class at this procedural juncture of the case.
This court has further noted that “ ‘[i]n the absence of materially changed or clarified circumstances, or the occurrence of a condition on which the initial class ruling was expressly contingent, courts should not condone a series of rearguments on the class issues by either the proponent or the opponent of class, in the guise of motions to reconsider the class ruling.’ ” Billieson v. City of New Orleans, 09-0410, 09-811, p. 9 (La.App. 4 Cir. 11/12/09), 26 So.3d 796, 802 (quoting Doerr, 04-1789 at p. 4, 935 So.2d at 234 (quoting Newberg, supra)). Contrary to FFIC’s | ^contention, the trial court’s recognition of FFIC’s Credit does not constitute a material change in the circumstances of this case warranting reconsideration of the trial court’s class certification ruling.
As noted, FFIC’s decertification argument also includes a constitutional component. Its constitutional argument is that due process and fundamental fairness considerations dictate granting its motion to decertify. In support, FFIC points out that the trial court’s March 2004 certification judgment should not apply to it because it was not yet a party to the suit, and it was not given an opportunity to appear and present evidence at the original certification hearing. FFIC further points out that its status as an excess insurer places it in a different position from the other defendants insofar as class *493 certification issues are concerned. Its position is different in that most, if not all, the class members will not have a claim against it until the underlying limits of $3,889,623.90 (FFIC’s Credit) are exhausted.
Plaintiffs respond that the issue of de-certification is not required to be reconsidered when other parties are added after the class is certified. In support of this contention, they cite Martello v. City of Ferriday, 04-90 (La.App. 3 Cir. 11/3/04), 886 So.2d 645. In Martello, the court addressed whether under La. C.C.P. art 592 an additional certification hearing is necessary when a plaintiff adds new defendants to a previously certified class action. Answering that question in the negative, the court explained that “[t]he clear wording of Article 592(A)(1) requires that a motion to certify the action as a class action must be filed ‘within ninety days after service on all adverse parties of the initial pleading.’ ” Martello, 04-90 at p. 4, 886 So.2d at 648. The court further explained that it is common “for an initial petition in a class action to be amended, sometimes several times, prior to a determination on the merits.” Martello, 04-90 at p. 3, 886 So.2d at 648. The court l^thus concluded that “Louisiana Code of Civil Procedure Article 592(A)(1) does not require that a new certification hearing be requested each time a petition is amended, either to add an additional defendant or to set forth a new cause of action.” Martello, 04-90 at pp. 3-4, 886 So.2d at 648.; see also Sellers v. El Paso Indus. Energy, L.P., 08-403, p. 12 (La.App. 5 Cir. 2/10/09), 8 So.3d 723, 729. Plaintiffs contend that FFIC is simply attempting to obtain an appeal of the class certification ruling.
FFIC’s constitutional arguments are unpersuasive. “A class action is simply a procedural device; it confers no substantive rights.” Galjour v. Bank One Equity Investors-Bidco, Inc., 05-1360, p. 7 (La.App. 4 Cir. 6/21/06), 935 So.2d 716, 723. We thus conclude the trial court did not abuse its discretion in declining to grant FFIC’s motion to decertify.
(4) Quantum of individual class representatives’ damage awards
The final issue to be addressed is FFIC’s contention that the trial court abused its discretion in awarding $20,000 in compensatory damages to each of the named class representatives. To provide a factual background for addressing the damage issue, it is necessary to summarize the evidence presented at trial regarding the damage sustained by each of the seven named class representatives as a result of the Algiers Water Tower project. All seven class representatives testified that they were exposed to sand and particles as a result of the project. With the exception of Melanie Gastinell Williams, all the class representatives testified that at the time of the project they lived in the neighborhood abutting the Algiers Water |anTower in homes that they owned.[14] The following is a summary of the class representative’s individual testimony.[15]
a) Helene Benn Jones:
• Address at time of water tower project, duration of residence at address, and *494 proximity of address to Algiers Water Tower: She lived at 3018 Carver Street, New Orleans, Louisiana. Ms. Jones has lived at address all her life. Her house is located across the street from the water tower.
• Identity of others residing at same address at time of project and relationship, if any, to other named representatives: She is the wife of Johnny Jones, III (also a class representative). At the time of the project, Mr. and Mrs. Jones had been married for three years. Ms. Jones has one child, a son, who resided with them. At that time, her son was seven years old.
• Employment status at time of project: She was employed as an administrative assistant. During the work week, she left for work at 7:15 a.m. and returned home at 5:00 p.m. When she returned home, the project work generally was still being done. She would still hear equipment. She also would hear one motor running all through the night.
• Physical symptoms resulting from project: She experienced really bad sinus headaches; eye, skin, and scalp irritation; and a lack of sleep due to the noise. Her sinus problems predated the project. She had surgery in 1998 to remove her sinus adenoids. Following her surgery, she had a seasonal sinus problem, but it was not as bad. When the project started, her sinus problem “was very bad again all over.” Regardless of whether she was outside or inside, she suffered with really bad sinus headaches, post-nasal drip, and scratchy throat. She could not sleep at night because of the allergies waking her up. She had a prescription for sinus medication, which was the same prescription she had before the project. For her other symptoms, she treated mainly with over-the-counter medication. For her eye irritation, she used eye wash and Vi-sine. For her skin irritation she used Phisoderm. For her scalp irritation, she went to her hairdresser; she did not go to a dermatologist because she knew how to treat it. (She explained that the sand would get in her hair and even in her husband’s bald hair.) Her symptoms lasted throughout the duration of the project.
• Property damage resulting from project: The air conditioning central heating unit at her house was damaged and had to be repaired; she related the | S1 damage to the sand from the project. She had peeling paint on the concrete and gutters. She explained that she had painted concrete on her driveway and porch that started peeling. She also had her house pressure washed once or twice. She also had sand inside of her house. During the project, she noticed a thick substance or heavy dust on her furniture and her air vents. She had to spend extra time cleaning; she estimated that she spent an extra five to six hours each Saturday cleaning. She would try to vacuum and clean the sand in her house, but it did not seem to go away. At the time of the project, she owned two vehicles. Sand was deposited on both vehicles and in the crevasses of the vehicles. When she tried to wipe the sand off her vehicles, it scratched the paint. She had to restore the canvas top of one of the vehicles. The dashboard of one of the vehicles dry rotted because of the sand. The problems she experienced with the sand damaging her property lasted throughout the project.
• Emotional distress resulting from project. She experienced a “good bit of stress” as a result of the project. *495 For her stress she never saw a psychiatrist, but she and her husband saw some of her husband’s colleagues, who were counselors, and their pastor. She was frustrated and angry. Due to the ongoing noise, she was irritable because she could not sleep. She had concerns about developing cancer or some other type of future illness. She also had concerns for her son who acquired allergies during the project. Her son never had allergies before the project. She testified that her son had a real bad reaction, that she had to bring him to the emergency room a few times, and that she thought she “was going to lose him during that time.”
b) Johnny Jones, III:
• Address at time of water tower project, duration of residence at address and proximity of address to Algiers Water Tower: He lived at 3018 Carver Street, New Orleans; this address is directly across the street from the water tower.
• Identity of others residing at same address at time of project and relationship, if any, to other named representatives: He lived with his wife, Helene Benn Jones (also a class representative), and their son.
• Employment status at time of project: He was employed as a school counsel- or and a coach. He worked week days and coached ball on Saturdays. During the work week, he was gone from home from 8 a.m. until 5 p.m. On Saturdays, he left home around noon to coach; the work on the project started before he left. He also was a Baptist minister on Sundays. On Friday and Saturday each week he would prepare his Sunday sermon. During the project, his thought process was interrupted by the noise.
• Physical symptoms resulting from project: The health effects he suffered were skin irritations (scratching and itching), sinus problems, runny nose, red eyes, minor headaches, and loss of sleep. He acknowledged that he had | o2sinus problems that predated the project, which he described as seasonal allergies. When the project commenced he had a clear aggravation or worsening of his sinus problems. In July 1998, he had a kidney-pancreas transplant; he was still under a doctor’s care for the transplant. He feared that his condition was placed at risk. Due to the project, he was stressed. The stress from the project resulted in him experiencing an elevated creatinine level. He was on two anti-rejection medicines for his transplant and was required to increase the level of those medications as a result of his physical reactions to the project. He reported the aggravation of his sinus problem to his treating physician and was given Claritin. He used Vi-sine for his eye problem and antibacterial soap for his skin irritation; these were both over-the-counter remedies. His physical symptoms lasted the duration of the project and were ongoing throughout. He acknowledged that he still had sinus problems at the time of trial. He also acknowledged that in his earlier deposition he testified that his sinus problems continued because there are certain chemical plants around the Algiers area.
• Property damage resulting from project: Sand was tracked into his house and on his wood floors, which were scuffed. He neither obtained an estimate nor actually repaired the wood floors. At the time of the project, he owned two vehicles: one brand new one and one older one. He was in the process of selling the older one, and he *496 ultimately donated it. Sand got into both vehicles. There were problems with the paint on the vehicles, including some scrapings. His new vehicle had fíne scrapes on it. He had one area of the vehicle repainted, which cost him about $700. He also had the vehicle buffed several times.
• Emotional distress resulting from, project: The property damage made him angry. He characterized the project as a “stressor.” He had been married for only three years, and he was the only provider for the family. He was concerned about his family potentially being exposed to lead paint. He also indicated that his family sometimes could not sleep because they could hear the generator from the project from inside their house. As noted above, he attributed his elevated crea-tinine level to the stress from the project. The only treatment he sought for the stress was to speak to two of his colleagues, who were counselors.
c) Barbara Benn:
• Address at time of water tower project, duration of residence at address and proximity of address to Algiers Water Tower: She lived at 2824 Casimire Street, New Orleans, La., which was right next to the water tower. Her house sits right below the water tower. She has lived there for forty-five years; she inherited the property from her in-laws.[16] At trial, she identified photographs her daughter took during the project depicting her house with a vehicle parked in her carport that was covered with sand.
ha* Identity of others residing at same address at time of project and relationship, if any, to other named representatives: During the project, her adult daughter, Robin Benn, had surgery to have a brain tumor removed. Following the surgery, she brought her daughter to stay at her house because her daughter was unable to care for herself. Due to the noise from the project, it was impossible for her daughter to rest at her house. She was “very nervous because she was concerned about her daughter.”
• Employment status at time of project: She was a full-time housekeeper.
• Physical symptoms resulting from project: Her symptoms were runny eyes, nasal drip, coughing, swelling, and puffiness in her face. She had pain from sinus drip and a sore throat. She has two pre-existing conditions: high blood pressure and sinus problems. Although her sinus problems predated the project, her sinus problems became worse when the project commenced. The project noise increased her blood pressure. She related her problems to the doctor that she was seeing as a participant in a blood pressure medication study. Usually her blood pressure is controlled by medication, which brings her blood pressure down to a lower level. During the project, she was unable to control her high blood pressure with medication. She acknowledged that no doctor told her the problem with her blood pressure was related to the water tower project; however, she explained that “[i]t was related to all of that noise and I wasn’t able to relax.” She further explained that “with all the noise and all the other stress, I could not rest. When *497 you don’t rest, your blood pressure do[es]n’t drop.” Her symptoms lasted until the project was finished.
• Property damage resulting from project: Describing the impact on her house from the sandblasting, she noted that “sand was flying all over.” She further noted that anything metal she had in her yard was corroded from the sand. Her iron lawn furniture, which she had bought for about $400, was corroded. The sand clogged up and corroded the gutters on her house. Her aluminum windows were corroded and covered with sand. Her metal patio cover also was corroded. The fan on her air conditioner compressor that sits outside was corroded and had to be replaced. She also had sand inside of her house. Some of her carpets had to be removed and cleaned. She was forced to spend a lot of time cleaning the sand. As to her vehicle, it was covered with coarse sand; and it was scratched when she tried to wipe the sand off of it. She had spots all over her vehicle. The impact on her property she experienced continued throughout the time the project was being done.
• Emotional distress resulting from project: She described her mental reaction to seeing the damage to her property as “very poor.” She was “highly stressed, highly depressed.” She described her mental reaction to her physical ailments as follows: “I was really agonized with all of this going on.” She described it as a horrible situation. Although she mentioned that she almost went to a shrink, she testified that she never went to a liMPsychiatrist. The only person she went to see about the mental anguish was Dr. Smith, the doctor she was seeking as part of a blood pressure study. She feared getting lead poisoning. She also feared what the silica would do to her and her family. As noted above, she was especially concerned regarding her daughter who recently had surgery. She could hear the noise from the project, which she described as the sounds of generators. She described the noise from the project as very loud. She could not hear her television. If she was talking to someone on her telephone, she could not hear them.
d) Evelyn Gastinell:
• Address at time of water tower project, duration of residence at address and proximity of address to Algiers Water Tower: She lived at 3005 Boyd Street, New Orleans. Her house is one short block from the water tower. She estimated that her house is a hundred feet from the water tower. There is an open field between her house and the water tower. Unlike for Hurricane Katrina, no one asked her to evacuate the area during the project.
• Identity of others residing at same address at time of project and relationship, if any, to other named representatives: She is the mother of Melanie Gastinell Williams (also a class representative).
• Employment status at time of project: Ms. Gastinell worked five days a week at the Lower Algiers Senior Citizens Community Center (the “Community Center”), which is located at 6400 General Meyer Avenue.[17] The Community Center is located a block away from *498 her house. Most of the time she walked to work. She was the executive director at the Community Center; her adult daughter, Melanie Gast-inell Williams, also worked at the Community Center.
• Physical symptoms resulting from project: The symptoms she experienced were burning eyes, burning skin, itching, coughing, nausea, and vomiting. She experienced these problems both at work and at home. She denied having any preexisting health conditions. She treated herself with over-the-counter medications for the itching and burning.
• Property damage resulting from project: Her grandchildren would drag the sand inside, and she could not leave the door open. She had to pressure wash her house because of the sand. She also had to replace the gutters on the house and' to install a new roof. She acknowledged that in her prior deposition testimony she indicated that she could not relate the problem with her roof to the sand. As to her vehicle, she indicated that sand came into her carport and got on her vehicle. Because the roof of her vehicle was partly canvas, she had to wash it every day.
| S5* Emotional distress resulting from project: She was “sick and frustrated.” She described it as “so terrible that it kept me from going to a psychiatrist because the noise and the inconvenience and the emotional turmoil that ... [she] was going through.” Her grandchildren could not play outside because of the sand in their head and eyes. She would slip and slide in the sand along the sidewalk, porch, and carport. She explained that while the project was being done she had to walk out her door with an umbrella over her head. She characterized the situation as “miserable.” Finally, she noted that she felt like she was “in a third-world country.”
e) Melanie Gastinell Williams:
• Address at time of water tower project, duration of residence at address and proximity of address to Algiers Water Tower: From 1995 to 2000, she lived at 2712 Williamsburg Drive, LaPlace, Louisiana. From 2000 to 2003 (her deposition was taken in 2008), she lived at 1804 Tiffany Drive, which also is in LaPlace. However, she was born and raised in Algiers. During the project, she worked in Algiers and her extended family resided there.
• Identity of others residing at same address at time of project and relationship, if any, to other named representatives: She is the daughter of Evelyn Gastinell (also a class representative).
• Employment status at time of project: Although Ms. Williams lived in La-Place, she worked as the Assistant Director at the Community Center in Algiers. The Community Center was located about a block and a half away from the water tower. As noted above, Ms. Williams’s mother, Evelyn Gastinell, also worked at the Community Center. At the Community Center, they had to sweep and vacuum the sand.
• Physical symptoms resulting from project: Her symptoms were eye problems (irritation or burning) and nausea. She did not receive any medical treatment for either the eye problems or nausea. She treated herself with over-the-counter medications.
• Property damage resulting from project: Because she and her husband would swap vehicles, both their vehicles were scratched due to the abra *499 siveness of the sand. She had to wash the vehicles repeatedly three and four times a week. In an attempt to remove the scratches, she had her car buffed and her husband’s car hand waxed. Some of the scratches did not come out. She denied having any property damage to any real estate she owned in the Algiers area. As noted above, she had to clean the sand at the Community Center.
• Emotional distress resulting from project: She claimed that she experienced discomfort, which she clarified that she meant inconvenience. As to her discomfort (or inconvenience), she explained that it was “just from being there [at the Community Center] with the seniors and making sure that they laswere all right.” She indicated that she experienced noise discomfort. She described the noise as an irritating, “hissing sound.” The noise was really loud from within her office. She could hear the noise while she was typing or if she was on the phone or coding something. She did not seek counseling as a result of these problems.
f) Bernice Noil:
• Address at time of water tower project, duration of residence at address and proximity of address to Algiers Water Tower: She lived at 3300 Albert Street, New Orleans. She has been living at that address for about forty years. She explained that there is a neighborhood located between her house and the area in which the water tower is located. She estimated that her house is about fifteen blocks below the area in which the water tower is located. Nonetheless, she testified that from her house she could hear some motors running that sounded like it was coming from the water tower project.
• Identity of others residing at same address at time of project and relationship, if any, to other named representatives: She is the sister of Augustine Cook (also a class representative). At the time of the project, she had an adult grandson living with her.
• Employment status at time of project: At the time of the project she was retired. She testified that her mother-in-law, who was over ninety years old, lived on Carver Street, the same street as the water tower. Her mother-in-law’s house is three houses from the water tower. She estimated that she would go to see her mother-in-law three or four times a week. She would sometimes spend the day, and she would help her mother-in-law with her cleaning.
• Physical symptoms resulting from project: She suffered with sneezing, which would last for days; coughing; and eye and throat irritation. The sneezing was on and off for as long as all the particles from the project was flying around. When she went inside it would not be that bad, but when she went back outside she would start sneezing again, and it would get really bad. She would still sneeze when she was inside, but it was worse when she was outside. Her coughing was “about the same” as her sneezing. She treated her eye irritation with Vi-sine eye drops. As to the throat irritation, she would have it for a few days at a time when she would have an attack. Approximately two weeks after the sandblasting started, she went to the emergency room for breathing problems and was given a breathing treatment. She denied having received any previous treatment for breathing problems.
*500 • Property damage resulting from project: She had to wash down her house, her trees, and her vehicle. She paid her brother $80 ($40 per job) to wash down her house on two occasions. She cleaned her trees and washed her car. | S7The damage to her house was “little paint chips,” which she attributed to washing it down. As to the damage to her vehicle, “the vinyl top got all messed up.” She explained that by messed up she meant it changed colors from white to “grayish looking.” She did not have it repaired; she just washed it. In response to the question of how much time she spent cleaning up her property as a result of the project, she answered that she spent a total of seventy-two hours. She explained that “[t]he whole job took that much time. The guy that washed my house down ... he washed half (1/2) of it one (1) time and then the other half (1/2) at another time, and then I did the shed, ... the shrubs and the trees. I did not do it all in one (1) day, but at different times.” She also stated that her brother-in-law had to wash down her mother-in-law’s house.
• Emotional distress resulting from project: She was “nervous with all of that stuff going on” and was afraid to go outside. She acknowledged that no doctor told her she could have any future medical problems as a result of the project.
g) Augustine Cook:
• Address at time of water tower project, duration of residence at address and proximity of address to Algiers Water Tower: She lived at 3120 Adrian Street, New Orleans. She has lived at that address for almost forty years. Her house is about six or seven blocks away from the water tower. Nonetheless, she testified that she could hear the project from where she lived.
• Identity of others residing at same address at time of project and relationship, if any, to other named representatives: She is the sister of Bernice Noil (also a class representative).
• Employment status at time of project: She was retired. She watched her grandchildren (three or four of them) during the day. She also would drive her family members around the area of the water tower. She drove her sister every day to her sister’s mother-in-law’s house on Carver Street two houses from the water tower. Her sister’s mother-in-law was ill, and they would sometimes linger at the mother-in-law’s house. She explained that she was unable to stay inside all day for two reasons. First, she had to go outside to wash her laundry in her utility shed. Second, she had to go outside to watch her grandchildren. Although she was concerned about what her grandchildren were being exposed to, she could not keep them inside all day.
• Physical symptoms resulting from project: She described her symptoms as a sinus infection, constant coughing, watery itchy eyes, and a rash on her arm. For her eyes, she used an eye moisturizer and an eye wash recommended by the pharmacy. She did not need a prescription for the eye wash. Since she had glaucoma she could not put too much eye drops in her eyes. For her breathing problems, she used a pump that she borrowed from her sister, who 138has asthma. For the rash on her arm, she used an over-the-counter ointment to treat it. She acknowledged that her seasonal sinus problems (allergies) predated the project, but she indicated that during the time they were sand *501 blasting her allergies were worse and were a “whole lot different.” According to Ms. Cook, she was treated at Charity for her sinus problem caused by the project. At Charity, she was diagnosed as having “chronic sinuses.” The doctor at Charity gave her a prescription for Zyrtec and Flonase (a spray), which were the same prescriptions she was receiving before the water tower project.
• Property damage resulting from project: She had dust on her house and vehicle. She had her nephew pressure wash her house, for which he was paid $50. She also had her house repainted. She had a separate utility shed that likewise had to be washed down and repainted. As to her vehicle, she had to wash it every day. As a result, it started looking faded, which she guessed was from washing the sand off of it.
• Emotional distress resulting from project: She was horrified thinking of what the lead could do to her. She acknowledged that no doctor told her she was at risk of cancer or future ailment. She was very emotional because it brought to her mind her husband who recently died of cancer. She felt nervous, nauseated, devastated, and could not sleep at night thinking about it. She did not see a psychologist or psychiatrist because she could not afford to. However, she spoke to the doctor when she went to the clinic (she is a heart patient), and the doctor informed her that the Zyrtec he had prescribed for her sinuses would also help with her nerve problem caused by to the work being done at the water tower. She did not, however, tell the doctor about lawsuits or anything of that nature. She indicated that the symptoms she suffered lasted throughout the project and beyond.
Also at trial, FFIC introduced the testimony of Dr. Merlin Wilson, who was qualified as an expert in the field of medicine with a specialty in allergies. In preparation for trial, Dr. Wilson was asked to review the depositions of all seven class representatives and the medical records of Ms. Gastinell, Mr. Jones, and Ms. Cook. Dr. Wilson initially testified that he found no complaints of an increased problem during the. time span of the water tower project (late 2001 to June 2002). However, on cross-examination he acknowledged that on February 19, 2002, Ms. Cook was seen at Medical Center of Louisiana (Charity) and that her medical records for that date state: “presents for sinus problems with a new complaint of problems with ... hoarseness, sinus problems, chronic sinusitis.” Dr. Wilson thus | .^acknowledged that Ms. Cook presented at the doctor with complaints during the pertinent time period.
Dr. Wilson was also questioned by Plaintiffs’ counsel regarding the National Institute for Occupational Safety and Health (“NIOSH”) Pocket Guide To Chemical Hazards — Silica (“NIOSH Guide”)[18] Dr. Wilson was asked to read the line in that guide addressing the potential symptoms that can result from exposure to silica sand; he replied: “[cjough, shortness of breath, a decreased pulmonary function, progressive respiratory symptoms.” He added that although these can be symptoms, “those are probably not allergic mediated.” Dr. Wilson also testified that he did not see in any of the documents he reviewed any allergic reactions caused by *502 the sandblasting project. He acknowledged that exposure to silica “can act as an irritant and make you cough, things like that.” He further acknowledged that he was not testifying that the individual class representatives did not experience what they related in their depositions or testimony, but “only that they didn’t visit the doctor for that specific problem.”
Based on the evidence presented at trial, the trial court found that “the class representatives did in fact suffer injuries as a direct result of the project on the Algiers Water Tower.” The court found that “extensive amounts of silica dust was emitted from the project and found its way into the neighborhood and impacted a substantial amount of people.” In support of this finding, the court cited the testimony of Dr. Mitchell, Plaintiffs’ air modeling expert, that “the neighborhoods adjacent to the Water Tower were impacted by significant considerations of particulate matter.” Based on its findings, the trial court determined that causation 140was established and that an award of $20,000 in compensatory damages to each of the class representatives was appropriate.
FFIC contends that neither the evidence in the record nor the jurisprudence supports a $20,000 award to each of the class representatives under the circumstances presented in this case. FFIC further contends that the $20,000 awards are inconsistent with the trial court’s class-wide awards. As FFIC points out, the trial court in its reasons for judgment outlined geographic zones based on proximity to the water tower. Relying on those geographic zones, the trial court awarded class-wide damages ranging from $1,000 to $4,000. Although the trial court’s amended judgment eliminates the class-wide awards, FFIC contends that the class-wide awards remain relevant. The relevance, FFIC explains, is that those class-wide awards, which ranged from $1,000 to $4,000, establish that the trial court’s awards to the class representatives of $20,000 each for the same injuries cannot be justified and thus are arbitrary. In support, FFIC cites the jurisprudence holding that the class representatives’ claims must be “‘a cross-section of, or typical of, the claims of all class members.’ ” Billieson v. City of New Orleans, 98-1232, p. 17 (La.App. 4 Cir. 3/3/99), 729 So.2d 146, 157.
Plaintiffs counter that the class-wide damage awards in the trial court’s original judgment have been reversed by the granting of the motion for new trial and are no longer pertinent.[19] Plaintiffs further contend that the awards to each class representative are reasonable and within the trial court’s vast discretion for 141 physical injury, property damage, mental anguish damage, and nuisance over an almost four month period.
FFIC’s reliance on the class-wide damage awards is misplaced for two reasons. First, the award of damages is an individual determination that must be made “based upon testimony as to an individual’s actual damages, not on expert testimony that it was ‘reasonable’ to assume someone closer to the source [ (release site) ] would suffer more damage than someone farther away.” Howard v. Union Carbide Corp., 09-2750 at p. 1 (La.10/19/10), 50 So.3d 1251, 1257-58 (Victory, J., concurring). Second, as *503 Plaintiffs point out, the class-wide damage awards were set aside as a result of the granting of the cross motions for new trial. Under these circumstances, an appellate court may only review the second judgment for error. Wilson v. Compass Dockside, Inc., 93-1860 (La.App. 4 Cir. 3/15/94), 635 So.2d 1171, 1176 (on reh’g). The class-wide damage awards thus are not before us on appeal and are not pertinent to our analysis of the class representatives’ damage awards.
Nonetheless, we find the trial court’s reasons for judgment are pertinent in reviewing the awards to the class representatives. Indeed, in its reasons for judgment, the trial court focuses on the trial testimony of the seven named class representatives in discussing the damages issue. Both the trial court’s original judgment and the amended judgment include the same lump sum damage award of $20,000 each to the class representatives.
It is well settled that the fact finder has great discretion in determining the amount of damages and that appellate courts should rarely disturb such an award. Youn, supra. Another well settled principle is that a lump sum damage award is presumed to award all items of damages claimed. Bryan v. City of New Orleans, 4298—1263 (La.1/20/99); 737 So.2d 696, 697 (collecting cases); Smith v. Tidewater Inc., 04-0195, p. 16 (La.App. 4 Cir. 3/2/05), 918 So.2d 1, 13; Dupuy v. Fitzpatrick, 00-1353, p. 7 (La.App. 4 Cir. 5/23/01), 789 So.2d 667, 671; Dorvilier v. Gagliano, 02-2765, p. 11 (La.App. 4 Cir. 8/27/03), 855 So.2d 393, 400-01; see also Frank L. Maraist and Thomas C. Galligan, Jr., Louisiana Tort Law § 7.2 (1996)(noting that “if a factfinder makes an in globo award, it generally is deemed to include all types of recoverable damages.”)
When as in this case a lump sum award is challenged as excessive, the “appellant’s burden of proving an abuse of discretion is more difficult because the intent to award a specific amount for a particular item is not readily ascertainable.” Reichert v. Bertucci, 96-1213, pp. 4-5 (La.App. 4 Cir. 12/4/96), 684 So.2d 1041, 1044 (citing Boutte v. Nissan Motor Corp., 94-1470, p. 12 (La.App. 3 Cir. 9/13/95), 663 So.2d 154, 161). To illustrate, this court in Matthews v. Ferrer, 95-0266, p. 8 (La.App. 4 Cir. 11/30/95), 665 So.2d 1211, 1215, affirmed a lump-sum award that included special and general damages. In addressing whether the general damage component of the award was excessive, we subtracted the special damages that were proven at trial from the lump sum and reviewed the remainder as general damages.
In this case, the trial court in its amended judgment awarded each class representative a lump sum award of $20,000 in compensatory damages. In its reasons for judgment, the trial court explained that the lump sum award was for the following four categories of damages: (i) physical pain and suffering, (ii) property damage, (iii) mental anguish, and (iv) nuisance. In determining whether the trial court abused its discretion in making the lump sum awards, we find it appropriate 14Sto divide our analysis into two parts: (1) the four categories of damages; and (2) the lump sum award.
(1) The Four Categories of Damages
The first category of damages is physical pain and suffering. In awarding damages for physical pain and suffering, the trial court noted that the class representatives’ testimony established that they successfully met their burden of proving the physical injuries they suffered *504 were a result of the defendants’ fault.[20] In so finding, the trial court reasoned:
• “Plaintiffs showed they sustained injuries from direct exposure to silica and other particles as a result of the sandblasting project.”
• The personal injuries that the class representatives testified they sustained included: “eye irritation, respiratory problems, aggravation of sinus condition, headaches, skin irritation, etc.”
• Although not all of the class representatives consulted a doctor about their physical injuries, “a few did relate their problems to their doctor, and others treated themselves with over-the counter medications.”
• “Testimony shows that many, if not all, experienced these conditions throughout the time that the project was being sandblasted, some 3 ½ to 4 months.”
• The trial court noted “Defendants’ argument that some of the medical problems pre-existed the sandblasting, making them not liable for those injuries.” Rejecting that argument, the court found that “most of those [medical] problems were aggravated by the project, and in Louisiana a defendant takes his victim as he finds him. Thus, the Defendants are ^Irresponsible for all natural and probable consequences of their tortious conduct.”
FFIC contends that because the symptoms alleged by the class representatives were neither severe nor permanent the trial court’s awards for physical pain and suffering were an abuse of discretion for four reasons:
• Louisiana law does not support “rewarding” class representatives with such disproportionately high awards, when the claims are the representatives are presumed to be a cross-section, or typical of, the claims off all class members.
• No class representative proved any serious or long-term health effects beyond their minor and transient symptoms, such as coughing and sinus irritation.
• No class representative sought medical treatment as proof of causation or severity.
• A review of damage awards for similarly minor injuries reveals that a high award is not warranted for minor and transient symptoms.
FFIC’s argument regarding improperly rewarding the class representatives is based on the trial court’s class-wide awards included in its original judgment. *505 As discussed above, FFIC’s reliance on the class-wide awards is misplaced.
FFIC’s next focuses on what it terms the class representatives’ “minor, transient” symptoms. It contends that the class representatives’ own testimony confirms that their alleged physical injuries were short term in duration and minor in severity. FFIC emphasizes that the jurisprudence holds that the primary factors to be considered in assessing the quantum of general damages for pain and suffering are severity and duration. The jurisprudence, however, also holds that general damages cannot be fixed with exactitude and that no mechanical rule exists for calculating general damages; rather, such damages are based on the particular facts and circumstances of each case. See Holford v. Allstate Ins. Co., 41,187, p. 745(La.App. 2 Cir. 6/28/06), 935 So.2d 758, 768 (citing Blue v. Donnie Baines Cartemps USA, 38,279, pp. 4-5 (La.App. 2 Cir. 3/3/04), 868 So.2d 246, 249). Whether the damages for physical pain and suffering are an abuse of discretion thus turns on the particular facts of the particular case.
FFIC’s next argument is that the class representatives failed to introduce medical evidence as to either the causation or the severity of their personal injuries. The trial court, rejecting the contention that medical evidence was required in this case, took “particular note of damages being awarded [in cases involving substances being generated from a project] without the rendition of formal medical treatment,” citing as an example In re New Orleans Train Car Leakage Fire Litigation, 00-1919 (La.App. 4 Cir. 4/20/05), 903 So.2d 9. FFIC contends that the trial court erred in finding medical evidence of causation and damages was not required.
FFIC cites the well-settled jurisprudence holding that “expert medical testimony is required when the conclusion regarding medical causation is one that is not within common knowledge.” Chavers v. Travis, 04-0992, p. 10 (La.App. 4 Cir. 4/20/05), 902 So.2d 389, 395; Hutchinson v. Shah, 94-264, p. 3 (La.App. 1 Cir. 12/22/94), 648 So.2d 451, 452 (citing Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1995))(noting that “when the conclusion regarding medical causation is not one within common knowledge, expert medical testimony if required.”) FFIC contends that “questions concerning the effects of silica in differing concentrations, distances and durations on individual plaintiffs are not ‘within common knowledge.’ ” It thus contends that the common knowledge exception does not apply in this case. In support of this contention, FFIC cites Johnson v. E.I. DuPont deNemours & Co., 08-628 (La.App. 5 Cir. 1/13/09), 7 So.3d 734.
|4(jln Johnson, supra, which was a suit for damages allegedly caused by chemical exposure from a plant explosion, the appellate court rejected the argument that the common knowledge exception applied. The court reasoned that “whether or not plaintiffs suffered injuries as a result of chemical exposure from the Dupont incident is not a determination based on common knowledge, so the plaintiffs were required to present expert medical testimony in order to meet their burden of proving medical causation.” Johnson, 08-628 at p. 8, 7 So.3d at 740. FFIC contends that the trial court erred in failing to impose the same requirement on the class representatives in this case. As a result, FFIC contends that the class representatives failed to link their alleged physical injuries to the project.
Plaintiffs, on the other hand, contend that expert medical evidence was not required and that their failure to obtain formal medical treatment for their symptoms does not defeat their claims. Plaintiffs *506 point out that their claims are not based on esoteric problems that would require proof by expert medical testimony. Rather, their claims are for symptoms within the common knowledge of the trial court to comprehend. Plaintiffs thus contend the trial court correctly concluded that expert medical testimony was not required to establish the class representations’ physical reactions and complaints of personal injuries they sustained as a result of their exposure to the sand (silica) from the project. Additionally, Plaintiffs point out that the evidence they introduced included the NIOSH Guide, which enumerates the expected reactions to silica exposure. (As noted above, Dr. Wilson was questioned regarding the NIOSH Guide.)
General damages for pain and suffering may be established in three ways: (i) the circumstances of the case, (ii) expert medical testimony, and (iii) the tort victim’s testimony. Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort ¡„Law § 7-2(c)(1996). In this case, causation of the class representatives’ physical pain and suffering as a result of the project was adequately established based on the circumstances of the case and the class representatives’ testimony. See Arabie v. CITGO Petroleum Corp., 10-2605 (La.3/13/12), 89 So.3d 307 (rejecting defendant’s argument that in order to prove causation plaintiffs were required to prove exposure by scientific evidence of air monitoring data). Thus, the trial court correctly concluded that medical evidence was not required to establish causation of the class representatives’ physical pain and suffering claims.
Although FFIC invites us to resort to a consideration of awards for generically similar symptoms and contends that the awards in this case are disproportionate to such prior awards for minor transient symptoms, the jurisprudence is settled that “resort to prior awards is only appropriate after an appellate court has concluded that an ‘abuse of discretion’ has occurred.” Cone v. National Emergency Services, Inc., 99-0934, p. 8 (La.10/29/99), 747 So.2d 1085, 1089. As subsequently discussed in this opinion, we find no abuse of discretion in the trial court’s awards for physical pain and suffering. Because we find no abuse of discretion in the trial court’s awards, a comparison of similar prior awards is inappropriate. See Jones v. Harris, 04-0965, pp. 3-4 (La.App. 4 Cir. 2/2/05), 896 So.2d 237, 240-41.
Finally, although FFIC contends that the trial court’s award of $20,000 per class representative is excessive for physical pain and suffering, this argument overlooks that this award is not solely for physical pain and suffering, but rather it is a lump sum award for all four categories of damages.
The second category of damages the trial court awarded is property damages. FFIC contends that the trial court’s award of $20,000 for property | ^damages to each of the class representatives is erroneous because “none of the class representatives introduced sufficient evidence to warrant a substantial property damage award.” FFIC emphasizes that the class representatives failed to introduce any receipts, invoices, or estimates as to the cost of repairing their property.
Addressing this argument, the trial court noted that the Defendants advocated the need for repair estimates based on a case involving a body shop, particularly Gagliano v. Namias, 479 So.2d 23, 25 (La.App. 4th Cir.1985). In Gagliano, this court noted:
Three tests have been utilized to determine property damage: 1) if the damaged object can be adequately repaired, the cost of restoration; 2) the difference in the value of the property before and *507 after the damage; 3) if the value prior to and subsequent to the damage cannot be determined or if the cost of repairs exceeds the value of thing damaged, damages should be the replacement cost less depreciation.
Gagliano, 479 So.2d at 25 (citing Decuir v. Sam Broussard, Inc., 459 So.2d 1375 (La.App. 3rd Cir.1984)(citing Roshong v. Travelers Ins. Co., 281 So.2d 785 (La.App. 3rd Cir.1973))). Finding the lack of this type of evidence did not defeat the class representatives’ property damage claims, the trial court noted that “a more general application of the law” was required that that advocated by Defendants. The trial court further noted that under La. C.C. art. 2315 the term “damages” has been construed to mean “‘pecuniary compensation, recompense, or satisfaction for injury sustained.’ ” Wainwright v. Fontenot, 00-0492, p. 5 (La.10/17/00), 774 So.2d 70, 74 (quoting Fogle v. Feazel, 201 La. 899, 10 So.2d 695, 698 (1942)).
The trial court found that the class representatives met their burden of establishing Defendants’ negligence and that Defendants’ breach of duty was a direct cause of their property damage, which occurred as a direct result of the [^sandblasting project. The trial court noted the following examples of property damage that the class representatives established they sustained as a direct result of the project:
• “Ms. Benn complained of damage from sand to her gutters, patio, yard furniture, windows, automobiles, and air conditioning unit.”
• “Mr. and Mrs. Jones testified that the sand damaged paint on the exterior of their home, their automobiles, gutters, and hard wood floors on the interior of the home.”
• “Finally, Ms. Gastinell testified that as a result of the sandblasting there was damage to the inside and outside of her home, including damage to her roof, gutter, and dirt in her home.”
Although FFIC in challenging the property damage award contends that the $20,000 award is excessive, this argument ignores the lump sum nature of the award.
The third and fourth category of damages that the trial court awarded to the class representatives are mental anguish and nuisance. Because of the overlap of these two categories, we address them together for ease of discussion. The jurisprudence has limited the recovery of mental anguish for damages to one’s property to four categories of cases:
(1) when the property was damaged by an intentional or illegal act;
(2) when the property was damaged by acts giving rise to strict or absolute liability;
(3) when the property was damaged by activities amounting to a continuous nuisance; and
(4) under circumstances where the owner was present or nearby at the time the damage occurred and suffered psychic trauma in the nature of or similar to a physical injury as a direct result of the incident itself.
50Doerr v. Mobil Oil Corp., 04-1789, pp. 8-9 (La.App. 4 Cir. 6/14/06), 935 So.2d 231, 237 (citing Frank L. Maraist and Thomas C. Galligan, Jr., Louisiana Tort Law § 7.02[6] (2d ed.2004)).
Recognizing the jurisprudential limit on mental anguish damages, the trial court found the evidence presented at trial established that the requirements for the third subcategory — a continuing nuisance — were met. In so finding, the trial court cited La. C.C. art. 667.[21] Based on *508 Article 667 and the jurisprudence construing that article, the trial court found that the water tower project constituted a continuing nuisance to the class members’ property. The trial court further found that the class representatives were entitled to compensatory damages, including damages for “physical ailments, ongoing property issues, and excessive noise disturbances.” The trial court still further found that such damages were due for the nuisance endured throughout the project.
On appeal, FFIC contends that the trial court’s finding of a continuing nuisance is erroneous. FFIC contends that this case is analogous to Barrett v. T.L. James & Co., 28,170 (La.App. 2 Cir. 4/3/96), 671 So.2d 1186. In Barrett, the appellate court affirmed a finding that the plaintiffs failed to establish the defendant’s operation of a concrete recycling project in connection with a highway | ¡^reconstruction project near their neighborhood constituted a nuisance. Similar to the instant case, the plaintiffs in Bamtt alleged they suffered personal injury (upper respiratory problems) caused by dust from the project and property damages caused by the accumulation of dust in their homes. Although the plaintiffs presented medical experts, them experts failed to corroborate a causal connection between the dust from the construction project and any personal injuries the plaintiffs sustained. Nor did the plaintiffs establish that the dust could not be removed from them homes by regular cleaning and vacuuming.
Based on the particular circumstances presented, the trial court in Barrett found that “the inconvenience was not unusual or extraordinary, considering the length of the project and the measures taken to minimize the project.” Barrett, 28,170 at p. 4, 671 So.2d at 1190. Affirming, the appellate court reasoned that “[wjhile noise and dust do not necessarily constitute a nuisance, in some instances they may be so, depending upon the particular circumstances.” Barrett, 28,170 at p. 7, 671 So.2d at 1191 (collecting cases). The holding in Barrett was thus based on the particular circumstances presented in that case, which are distinguishable from the circumstances presented in the instant case.
The relevant factors that a court must consider in making the factual finding of whether a nuisance has been established under La. C.C. art. 667 are as follows:
(a) The place where the activity occurs. Here one considers the neighborhood, zoning and planning standards, environmental goals. That which would be unreasonable on St. Charles Avenue might well pass muster in the marshes of Terre-bonne Parish.
|S2(b) The importance of the activity to the community as a whole. This is of great importance in determining whether an activity should be banned or merely regulated, or condemned to pay damages for continuing to operate as well as for past damages.
(c) The possibility, feasibility and cost of measures which would eliminate or reduce the harm to neighbors.
(d) The sensitivity of the one complaining. Obviously, in the absence of *509 malice, the courts cannot be expected to let the matter be governed by the most sensitive neighbor.
12 Ferdinand F. Stone, La. Civ. L. Treatise: Tort Doctrine, § 248 (1977).
Applying the above factors, the trial court found the particular circumstances presented here constituted a continuing nuisance. The trial court noted that because the water tower abutted a residential neighbor Defendants had a combined duty to use “utmost caution” throughout the project, and Defendants breached their duty by using an 85% shroud as opposed to the mandatory 100% shroud. The trial court further found that Defendants should have known that this deviation would result in particle emissions that would inevitably cause damage to the abutting neighborhood residents. Finally, the trial court found Defendants “could have prevented the resulting damages by exercising reasonable care and implementing the use of the 100% containment shroud.” Contrary to FFIC’s contentions, we find no manifest error in the trial court’s factual finding of a continuing nuisance. Under the particular circumstances presented in the instant case, unlike the circumstances presented in Barrett, the noise and dust constituted a nuisance.
As to the mental anguish resulting from the continuing nuisance, the trial court found that the class representatives were entitled to damages throughout the duration of the project. The trial court noted that all the class representatives | .^testified they experienced mental anguish and emotional distress as a direct result of the sandblasting activities. The court further noted that:
“Mrs. Jones testified that the ongoing noise prevented her from sleeping and also testified that she experienced a pervasive fear of developing cancer and a concern for her son’s health, which resulted in stress and other mental issues. Furthermore, Mrs. Gastinell testified that she was so aggravated by the noise of the operation and the damages to her home from the sand particles that she contemplated treatment from a psychiatrist. Additionally, the sandblasting project and the noise therefrom persisted for 3 ½-4 months.”
We find the trial court’s determination that the class representatives established their claims for mental anguish is not manifestly erroneous. As the above summary of the class representatives’ testimony indicates, many of them complained of the noise from the project disrupting their daily activities. They all complained of experiencing inconvenience as a result of the project.
As noted, the trial court found the mental anguish damages that the class representatives were entitled to recover for nuisance were for their “physical ailments, ongoing property issues, and excessive noise disturbances.” FFIC contends that the trial court erred in including in this part of the award elements of damages that are encompassed in its prior awards for personal injuries and property damages. According to FFIC, the only element of mental anguish that is not encompassed in the trial court’s prior awards is for the class representative’s loss of sleep caused by the noise disturbances. FFIC contends that an award of $20,000 for this claim is clearly excessive. Again, FFIC’s reference to the $20,000 award ignores the lump sum nature of the award. Likewise, FFIC’s argument | ¡^regarding the duplica-tive nature of the award is belied by the lump sum nature of the award.
In sum, we find the record supports the trial court’s finding that the class representatives were entitled to recover all four categories of damages included in the lump sum award.
*510 (2) Lump Sum Award
Given that the record supports the trial court’s finding that the individual class representatives established their entitlement to damages for physical pain and suffering, property damage, mental anguish, and nuisance, we turn to the final issue presented of whether the lump sum award of $20,000 to each class representative for all four categories of damages is an abuse of discretion. FFIC contends that the awards are an abuse of discretion for all the reasons noted above. Plaintiffs counter that the trial court’s lump sum awards are not an abuse of discretion given “the ongoing length of time the plaintiffs were exposed, them physical complaints, the mental anguish and upset they suffered, the affront to their families and neighborhood, and the physical damages they sustained to their property.” The gist of Plaintiffs’ argument is that the synergistic effect of all the injuries they endured for the duration of the project supports the amount of the lump sum awards. We agree.
The jurisprudence is well settled that “the discretion vested in the trier of fact is ‘great,’ and even vast, so that an appellate court should rarely disturb an award of general damages.” Youn, 628 So.2d at 1261. As noted, another | jurisprudential principle applicable here is that the appellant’s burden of establishing such an abuse of discretion is greater when the trial court has made a lump sum damage award. Applying these principles, we find the trial court’s award in this case is not an abuse of discretion. Given the particular circumstances presented in this case and the testimony of each of the class representatives regarding the particular damages they each experienced as a result of the project, we cannot conclude that the $20,000 in compensatory damages awarded to each of the seven named class representatives is excessive. We thus find that it unnecessary to resort to a review of damage awards made in other similar cases.

DECREE

For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED

. As a result of a previous project to paint the Algiers Water Tower a similar lawsuit was filed in June 1989, "alleging that defendants’ sand blasting operations on an Algiers water tower released airborne sand particles which caused personal injury and property damage" Martin v. Mid-South Tank Utilities Co., 614 So.2d 319 (La.App. 4th Cir.1993). In Martin, we affirmed the dismissal of that suit as prescribed.

. FFIC did not raise in its motion for summary judgment the issue of whether S & WB was covered as an additional insured for its own negligence.

. In Gasquet, the plaintiff settled her claim with the defendant's primary insurance carrier for less than policy limits and then proceeded against the defendant's excess insurance carrier. The issue was whether as a result of that settlement the plaintiff released the excess carrier from its liability. Answering that question in the negative, this court held that a defendant may be released with his rights reserved against an insurance company.

.The trial court in its judgment states that the settlement amount was $3,889,623.90, but the actual settlement amount apparently was lower. Although a copy of the settlement agreement is in the record on appeal, it is sealed. This court denied FFIC’s motion to be allowed access to the settlement agreement. Regardless of the amount of the settlement, the credit an excess insurer in FFIC's position is entitled to receive as a matter of law is equal to the policy limits of the underlying primary insurance. See Gasquet, supra. The amount of the credit FFIC was awarded, $3,889,623.90, is equal to the amount of the underlying primary insurance: Royal’s policy limit of $2,000,000 and AISLIC's policy limit *481 (after deduction of approved fees and costs) of $1,889,623.90.

. The trial court in its judgment dismissed with prejudice the claims against Delta given there was no finding of fault on Delta’s part.

. The trial court’s written reasons for judgment were issued in connection with its initial judgment that was set aside as a result of the granting of the cross motions for new trial. Under these circumstances, an appellate court may only review the second judgment— the one rendered on the granting of the motion for new trial — for error. Wilson v. Compass Dockside, Inc., 93-1860 (La.App. 4 Cir. 3/15/94), 635 So.2d 1171. Nonetheless, when the trial court issues written reasons for the original judgment but not the second one, it is appropriate on review of the second judgment to consider the original reasons for judgment to the extent they remain relevant. This is especially true when, as in this case, the trial court in its second judgment references "the reasons assigned,” apparently referring back to the original reasons for judgment.

. FFIC asserts four assignments of error:
1. Plaintiffs’ claims against FFIC should have been dismissed, with prejudice, because the judgment, by its own terms, awards a total of $140,000.00, subject to a $3.9 million dollar credit in favor of FFIC, which credit would have to be exhausted entirely before plaintiffs could recover the first dollar from FFIC.
2. The class certification in this case cannot be maintained because the framework of the trial court’s judgment, necessitated by the plaintiffs’ election to do a piecemeal settlement, creates an untenable, ill-defined, and inherently conflicted class, and could impose that unworkable class on FFIC, over FFIC’s timely objection and requested decerti-fication in its Motion for New Trial and despite FFIC's addition to the litigation as an excess insurer, more than a year and a half after the original class certification order was issued.
3. The damage award given to the named plaintiffs cannot stand because it is arbitrary and unsupported by evidence in the record presented.
4.Under the finding of the trial court, the S & WB cannot be an additional insured of FFIC because, under the terms of the FFIC policy, the S & WB is not an additional insured for its own fault, which the court expressly determined to be fifty percent (50%) of the aggregate liability in the case.

. Answering the appeal, Plaintiffs pray that:
1. the amount of the credit granted to FFIC in the amended judgment be reduced by one million dollars (from $3,889,623.90 to $2,889,623.90) based upon the one occurrence limit coverage provided in Royal’s policy: and
2. should there be any change in the allocation of fault determined by the trial court or any change or modification of any damages or insurance coverages, that they be appropriately re-allocated and/or adjusted so as to maintain the judgments rendered in favor of plaintiffs/appellees.
Given that we affirm the judgment of the trial court in all respects, we pretermit addressing this second issue raised by Plaintiffs. We further note, as FFIC points out, that Plaintiffs did not list this second point in the issues presented, nor did they brief it.

. The contract between Capitol and the S & WB required Capitol to purchase insurance to protect the S & WB from claims "which may arise from any operations under this contract or any of its subcontracts. The coverage shall contain no special limitations on the scope of protection afforded the Board.”

. The "follow form” term of FFIC’s policy provides:
A. Coverage A — Excess Liability — Insuring Agreement
1. This coverage applies only to injury or damage covered by Primary Insurance. The definitions, terms, conditions, limitations, exclusions and warranties of Primary Policies in effect at the inception of this policy apply to this coverage ...

. Royal’s policy defines "Your work” to mean:
a. Work or operations performed by you or on your behalf; and
b. Materials, parts or equipment furnished in connection with such work or operations.
The policy further provides that "Your work” includes:
a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work”; and
b. The providing of or failure to provide warnings or instructions.

. The endorsement at issue in Miller provided that:
It is agreed that, if required by written contract, any person, firm or organization is included as an Additional Insured but only with respect to operations performed by the Named Insured or to acts or omissions of the Named Insured in connection with the Named Insured’s operations.
Miller, 01-2907 at pp. 5-6, 859 So.2d at 163.

. This amount includes $1,889,623.90 for the AISLIC policy (after deduction of approved fees and costs) and the Royal policy aggregate limit of $2,000,000.00. Plaintiffs’ argument is that the Royal policy per occurrence limit of $1,000,000.00 applies, which would reduce FFIC’s credit by one million dollars.

. Almost all the class representatives testified that they were participants in an earlier litigation arising out of an industrial explosion that impacted the area where they lived.

. The deposition testimony of two of the class representatives (Bernice Noil and Melanie Gastinell Williams) was introduced in lieu of live testimony. Ms. Williams was ill. Bernice Noil, according to the testimony of her sister (Augustine Cook, another class representative), recently had surgery.

. Ms. Benn indicated that her husband was part of a lawsuit filed the prior time the water tower was painted; however, she was not.

. The Community Center is not a residential facility, but rather a social type facility. Each day they pick up senior citizens. The seniors come to the center for their meals and social activities, and they take them on field trips.

. Plaintiffs introduced a copy of the NIOSH Guide into evidence at trial as one of their exhibits. The NIOSH Guide apparently was issued by the United States Department of Health and Human Services.

. Plaintiffs point out the apparent reason for the trial court’s inclusion in its original judgment and reasons for judgment of class-wide damage awards based on geographic zones is "because of the parallel efforts to determine the amounts to be distributed out of the settlement.” Plaintiffs further point out that "zones and generalized damages were referred to in the Plan of Distribution for the settlement.”

. As we noted in Chavers v. Travis, 04-0992, pp. 7-8 (La.App. 4 Cir. 4/20/05), 902 So.2d 389, 394:
A plaintiff in a personal injury case has the burden of proving by a preponderance of the evidence that the accident more probably than not caused a claimed physical injury. See Jones v. Peyton Place, Inc., 95-0574, p. 12 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 763. The test for determining the causal relationship between an accident and a subsequent injury is whether the plaintiff proved through either medical or lay testimony that it is more probable than not that the subsequent injuries were caused by the accident. Jones, 95-0574 at p. 13, 675 So.2d at 763.
Whether the accident caused the plaintiff's personal injuries is a fact finding reviewed under the manifest error standard. See American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991); see also Guillory v. Insurance Co. of North America, 96-1084, p. 1, n. 1 (La.4/8/97), 692 So.2d 1029, 1036 (Lem-mon, J., concurring)(noting that "there are often factual issues in a review of an award of general damages, such as whether a certain condition was caused by the tort.”)

. La. C.C. art. 667 provides:
Although a proprietor may do with his estate whatever he pleases, still he cannot *508 make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.